Appeal of the Government Ms. Fannin against all the hard cases it seems, happy to see you again as well as Ms. Kidmiller. We'd like to proceed as soon as you can be ready. This may have pleased the Court. Congress delegated to OPM in the Federal Employee Health Benefits Statute the authority and the discretion to administer the program. We know all that. That's the obvious given part of the case. Do you not agree that in promulgating the regulation dealing with the final year, OPM, while having broad discretion to structure it for convenience, efficiency, honesty, etc., doesn't have unlimited discretion? It doesn't have unlimited discretion. So then the question becomes, well, what is the standard that they have to meet in order to have a valid regulation? And the trial court here, as I essentially understand it, held that the final year regulation was not consistent with the statutory language that referred to costs and an equitable assessment of costs. The trial court, in our view, made at least five significant errors, the first one being failing to follow the axioms of administrative law under Chevron and actually this Court's recent decision in Haas v. Peek. Wait a minute. We all can agree very readily that Chevron deference is not available if the regulation in question, although correctly promulgated by the agency of jurisdiction, is inconsistent with the statute that the regulation is implementing. Now, I read Judge Horne's decision as exactly so finding that this regulation dealing with the final year, not the rest of the regulations, but the section dealing with the final year, conflicts with the statute and therefore doesn't get Chevron deference. So it seems to me in order to prevail, you have to convince us that no, it doesn't conflict with the statute. It's actually entirely consistent with the statute. Right. The statute 8902 i, which is quoted at page 27 of our main brief, does not require reconciliation of rates for community rated plans. Of course it doesn't. We can see that from the plain text. But it does refer to costs. So it seems to set a standard that the regulator, the regulation writer, has to follow in creating the complex mechanisms and methodologies for implementing the statute. The reference to costs, again, OPM was charged with deciding for community rated plans, prepaid plans, what the term costs mean. And this is another error of the trial court, never really discussed community rated plans and seemed not to understand that costs for these plans are. Part of the problem I have with the argument I had at the brief is this kind of, what I regard as disingenuous, dissociation of costs from reconciliation. And you have on one hand the rate that plans charge SSSGs. And then you describe the other alternative as the actual costs that the plans incur. How much daylight is there actually between those two things? There's quite a bit. Actual costs apply only to experience rated carriers. Just talk about the community. Forget those. For community rated plans, the carriers propose a rate to OPM. They negotiate a rate. They agree on a rate that's to take effect January 1st of the government's year. I understand that. Let me ask that one base question. A community based plan, have they consistently had an incentive, an economic incentive, to try to charge the subscribers as little as they possibly can so that they get more people to sign up for those programs? And then figure that if they're getting them a much better deal than they are to the SSSGs, an acronym I don't like, that the government will make up for it later. Has that been a practice? Has that been the incentive? Most of the time in reconciliation, but when it is done, does the government wind up paying? There's no evidence in the record to that effect, Your Honor, but the purpose of reconciliation is to make sure that when the carrier negotiates and sets a rate for January 1st, that later in the year, they don't give a better rate advantage or discount to the government, which would then end up subsidizing the whole thing. You mean to the private part? To non-federal. It could be public or private. You said to the government, but you mean to non-government. So that on January 1, the rates go in effect for the government, but on March 1, for example, if the government is charged $100 for a family, that the carrier doesn't then give a discount of 5 or 10% to the non-federal groups in March. And so what reconciliation does is attempt to compare the rates, not the cost, but the rates later on so that if the non-federal groups get a 5% discount and the government gets the benefit of the best discount, it's kind of like a most favored nation clause. It works the other way around too, doesn't it? Yes. If the community group is charged at a higher rate, then an adjustment is made and money is sent to the vendor. Adjustment for the following year, if there is a following year. But the regulation read as a whole and in context, which is at addendum page 45 of our blue brief, basically under this regulation, OPM says that for these contracts, which these carriers are community rated as defined in Fee Bar 1602-172. And all of this is set forth in the Federal Register publications, which are in volume three of our appendix with the proposed regulation and the final. So OPM defines what community rated are. Number two says a subscription rate shall be equivalent to the SSSG. So equivalency is the key. It has nothing to do with actual costs. We understand that actual costs don't govern. Right. But the vendor gets a break, gets paid more by the government than the rate stipulated before the start of the year if it turns out that he's charging the private clients more. There is an adjustment made to the following year. Right. But what OPM decided in 1989-90, if there is no final year, if the carrier chooses to exit the program, there's no reconciliation because at the time OPM had experienced the situations where carriers that are departing were maybe less than cooperative in producing their records. And this was, again, included in the Federal Register, the proposed regulation, that kind of detail. Another error the trial court made was saying, well, this didn't show that there was a—it was only a historical, apparently nonrecurring, isolated problem. Well, that's not what the evidence showed at all. What deference means is that the court should defer to OPM's experience in saying, look, we had these problems. One of the carriers— What difference does it make how often they had problems? If a given carrier can't prove that it charged its private clients higher, then obviously it doesn't get the upward adjustment. But why is that any reason to not give upward adjustments to other carriers who can prove that their private clients had a higher rate? Well, again, as the Haas decision recently from this court said— No, no, no. Don't tell me about decisions of the court. What is the logic of saying because some firms had bad records, that means we can't give an upward adjustment to all the other firms even if they have good records? The logic is that OPM had to decide in balancing a lot of different factors how to allocate the risk. And they decided that for the final— They don't have to decide how to allocate the risk. They can simply do the same thing in the final year that they do in every previous year. They decided that there were incentives for carriers not to cooperate with records. And if this court were to accept what the trial court did, it would put a greater risk on OPM, whereas OPM had decided on an equal sharing of the risk that the contractors knew going into these contracts 10 years before they chose to exit the program, that there would be no reconciliation in the final year. No one can claim that the contractors were misled. We all know the rules have been clear. They've been clear for years. They've been applied. Everybody knew before the game started what the rules were. That's not the issue. The issue seems to me to be whether OPM's regulation is just totally irrational, that it has nothing logically to do with the problem that it supposedly is solving. It's not irrational because OPM said it had trouble getting records. In the records— Let's assume it did frequently have trouble getting records from particular vendors, particular carriers. What's the logical connection between that fact and saying that, therefore, nobody, no matter how good their records are, gets reconciliation in the final year? Because OPM had to decide how to allocate its resources, and one thing we disagree with is that the records for these carriers were not necessarily adequate. We have included the reconciliation guidelines and instructions in our— Stick with me because you keep going off onto other points. If the problem is some carriers have bad records, why is the logical solution to have no reconciliation in the final year for any carrier? Because the government can draw the lines and figure out how to use its resources. Some carriers— I don't know what you mean by that. Some carriers who feel they might have good records, maybe these would come forward if they felt that they were entitled to an adjustment and wanted money. But the carriers without good records might not come forward, and OPM didn't have the resources to—they don't look at all the records. Wait, wait, wait. They have the resources to do it every other year, but just not the last year. I don't understand how the resources suddenly disappear if we're in the last year of the contract, but in all the prior years of the contract of a given carrier, they have enough resources. It doesn't make any sense to me. I can't follow that. Because OPM had found that in the final year, many carriers did not have the records, and it had the evidence that for one of the carriers in 89, that MaxiCare, which is on page one of volume three of our appendix, MaxiCare had 14 plans, didn't have the records. Actually, OPM thought they might have owed the carrier money, but they weren't. Are these reconciliations done in April of the calendar year in question? They're done following the planned year, after the fact. Are they done after the fact, or are they done during the course of the applicable contract year? My understanding is that in the year prior to the contract year in question, there's an estimate made at a certain point, and then at a certain point later on, there's a comparison with the SSG rates, and then in April of the actual contract year, there's an adjustment, even if that contract year happens to be the last contract year. So there's an ongoing opportunity, is there not, to fill in gaps with missing documents? Well, that's where OPM found it. Yes, there's regulation contract provisions requiring them to keep records, but often carriers had not because the reconciliation— But that would be true any time with respect to any arrangement. Not with respect to a continuing relationship. There was an incentive for carriers who intended to continue to maintain a good relationship with OPM and have the records. But the records that OPM looks at in reconciliation are—it's a simple questionnaire. It's in the appendix. They don't look at records. The carrier checks a box. What method do you use? What are your age, gender? What's your enrollment mix? Who are the SSSGs? They don't look at records. Everything is subject to audit. The OIG audits only a limited number of times, and what OPM had found in its experience, which it had made part of the record of the proposed regulation, was that it had difficulty getting records from carriers who were leaving the program for which there was no continuing relationship with OPM. Let me back up just a little bit. As I understand your argument, your contention is that the reconciliation simply sets forth a parity for the federal employee rates compared to non-federal employee rates and that it's all about adjustments in rates and it's not necessarily about an adjustment to reflect costs and that the statute talks about adjusting rates to make sure that they reflect the costs. Is that correct? The statute says rates charged shall reasonably and equitably reflect the cost of the benefits provided. The petitioners misquoted that. They say that the statute says reflect the cost of the actual benefits. There's an argument that I think you could make, and I'm at sea as to why you didn't make it, and that is the statute talks about reasonable and equitable, dealing with their costs. I had thought when I first looked at this program that the government was treating the rates charged SSSGs as a proxy for costs and another way of calculating them in the context of this particular issue because one would assume that if the carrier is still in business, it's because it is making a profit on the SSSGs, and if it's making a profit on the SSSGs and it charges the federal employees exactly the same rate, then you would know that they would be reasonably and equitably recompensed for their costs. That's what I think the justification you want, but I don't see it anywhere. Well, we did make the argument, Your Honor, that the reconciled rates, assuming a continuing program, really are a proxy, and in our Rule 28 letter on Haas, which talks about the best proxy, that's what agencies do in their expertise and judgment. They try to figure out, and as we argued, there could be a range of rates that would be reasonable and equitable. The statute does not require that the rates be the exact same dollar amount, simply that, as the regs say, there should be an equivalency there of fairness. It sounds like you're agreeing with Judge Zabel. Yes, that these rates, there are a range of rates. OPM can decide how it's going to determine what the best proxy might be, and OPM is looking for the biggest discount and getting all the rate advantages that a carrier might give later in the federal year to non-federal groups, SSSGs. Why does this change in the final year? If this is the right thing to do in all the pre-final years, why isn't it equally the right thing to do in the final year? Because as OPM's rationale was that its experience had been it was really difficult in the final year to get the information it needed from carriers who were abandoning their relationship with OPM. With no continuing relationship, it was a lot harder. So OPM decided well, we'll... What was the basis of saying that that was the experience? What was the evidence? The evidence was, and again, that's in the Federal Register Publications, two letters that OPM had sent saying that, for example, with MaxiCare, it was one big company with 14 plants in nine different states that it had trouble getting information. And there was another carrier that went back... I saw the letter, but it doesn't look very convincing to me. It's a self-serving statement from OPM that they're having undefined problems with somebody. Based on what? What's the evidence? What was the problem? What did they ask for? What was refused? When did it happen? What were the delays? Were the records destroyed? Were they stolen? Were they fraudulent? What were the facts? And what percentage of the total plants were these difficulties found? That was not in the record, but the universe that should be looked at really was the number of departing plants. What's that number? Is that the denominator in the proper fraction? What's the number? The Kitchak Declaration that the court had admitted to help explain the record, and the court did admit that in footnote 5, gave more detail on the difficulties OPM had experienced. What's the total number? You're saying the right number to look at is those who departed the program. Good point. What is the number? That number is not in the record, but the total number of plants participating as of around 2000-2001 were about 200 plants, and only a universe substantially less than that. Well, how do we know how much less it is? The number is not in the record, Your Honor. Well, do you know the number? No, I don't, Your Honor. But OPM, even the trial court realized that an agency can make a decision based on a handful of experiences, and that's what OPM set forth in the Federal Register notices about its reg. Considered comments that were submitted, made some changes to some of the regs, but kept this one in the July 1990 Federal Register. But usually when you have an agency that makes a decision on a handful of experiences, it's because all of the similar experiences are represented in that handful. It's one thing to say you can do something because this has happened seven or eight times, and on each of these occasions there's a terrific problem. It's another thing to say that there are 200 instances of this, or 100 instances, or 20 instances, and in two of them things went south. The handful cases are usually cases in which the handful is all there is. And there is nothing to show in the administrative record here and the adoption of the regulation that what you were talking about was any significant percentage. Even a small percentage might be significant, but there was no justification of this at all. And what you told me now about reconciliation and its records is they have the records. What you're concerned about is the audit afterwards. No, Your Honor, they didn't necessarily have the records. For these three characters there was enough information given on this very bare-bones questionnaire that OPM did the calculation. That's true. And in one case they sent the check. And then later wanted the money back. Yes, and they recouped it. That's correct. But the reconciliation questionnaire throughout it says it's subject to audit, and when a carrier leaves, OPM's experience had been, and it makes sense. So then your answer to Judge Zagel is yes. What I'm really worried about is not the calculation done in April. I'm worried about a potential audit five years later. The reconciliation is not audited. That's correct. And so OPM was concerned that they would not be able to get a real handle on what these numbers should have been. Before you sit down, I just want to follow up on Judge Zagel's question and make sure I understood what you were saying. Are you saying that the rates are a proxy for costs? No. The rates are a proxy for reasonableness and fairness. The rates for community-rated... Because I understood your argument to be essentially that the regulation requiring adjustment or reconciliation simply adjusts for purposes of fairness so that the federal employees are paying the same as nonfederal employees and that it's not manifestly contrary to the statute, which simply says that the rates charged have to reasonably reflect costs. That simply making parity between federal and nonfederal rates doesn't necessarily have anything to do with assuring the reasonable reflection to costs. Right, for prepaid carriers. And the key here is that the adjustment that is made does not reflect any change in the rates for the existing year, and that's B-5 of the regulation, because once the rates are set for January 1st, OPM pays the same, the enrollees pay the same, the carriers receive the same rate. That has never changed for that year. Any adjustment would be made, if at all, to the continuing year if there is a continuing year. So the adjustment or reconciliation does not change the rate in effect for that year. It doesn't change the rate, but it changes the total amount of money that the carrier earns, because they get the rate plus the check for the difference between the government rate and the private rate, right? They would get a rate plus an adjustment for the following year, not necessarily a check. It's possible it could be a check, but it could be that it's an adjustment. It doesn't reflect a change to the existing year at all. Those rates never change. Now, I understand the rate doesn't change, but I'm saying doesn't the total revenue of the carrier change considerably? It might, but it wouldn't reflect a change for that year in OPM's view. It would reflect a change for the following year. The adjustment affects the year in question. The adjustment is made in April for the year in question. The calculation is made during that year, but it reflects not a change to the rate for that year. It reflects a change to the next year. That's correct, but it reflects the payment that's made. It doesn't reflect a payment and a difference in money. That's true. All right, thank you. Let's hear from Mr. Nadel. May it please the Court, I'd like to begin with the government's answer to Judge Zagel's question because I think I heard the government making our argument. The government said the reconciled rates are a proxy for fairness and reasonableness, and the government said OPM can determine what the best proxy might be. That is the position that the plans are taking. OPM has determined that the reconciliation process satisfies the fair and equitable and reasonable requirement of 8902I. For every year except the last year. That's correct. OPM has determined that it satisfies the statute, but they depart in the last year, and that is our challenge, that it's arbitrary and capricious and contrary to law to depart in the last year. The Court of Federal Claims found that the departure was arbitrary and capricious, and the standard for arbitrary and capricious is, does OPM have any rationales that are reasonable? Now, the administrative record contains only two rationales. The first, as the Court noted, is that purportedly, OPM has difficulty getting adequate data from the plans to do the reconciliation. That rationale is not tied to the regulation here. The regulation here, which the government calls the non-reconciliation regulation, does not say that the reconciliation does not occur. And, in fact, the reconciliation does occur, as it occurred with the three plans here. What the regulation says is, when the reconciliation occurs, we're not going to do the payment. Adequate data is not tied to whether the payment occurs or not. If there was not adequate data, it might make sense not to do a reconciliation, maybe. But that is not what's happening here, and that's not what happened with the three plans. It's sort of convenient for the government to not have to pay the check in the final year. They save a lot of money. They do save money, although you might also look at it from the perspective of the taxpayer and see that what this is is administrative convenience, or the government just saying, we don't want to go ahead and do this. For every Scott and White, which finished $3.8 million behind, there could be a plan that finishes $3.8 million ahead. And in that case, the regulation says, the government will walk away. The contractor gets to keep them. So it sounds like there's a high potential, given this regulation, for two harms. One is that taxpayers get cheated, and the other is that the carrier gets cheated. That's correct, Your Honor. And if you look at the administrative record, you see that OPM's own Office of the Inspector General recognized this harm when the regulation was promulgated. It said, we are concerned that plans will be able to walk away with money. And if you look at OPM's response to OIG, it said, we have determined that we are generally unable to get records. And then when you look at the administrative record here, you see that that only happened in two instances. And as you noted, and the Court of Federal Claims noted, there was no rationale for why that occurred. And even if there were a rationale, that might justify not doing a reconciliation, because you can't do a reconciliation if there isn't data. But it doesn't justify doing a reconciliation and then withholding payment, either from the government or from the plan. Now, the second rationale in the administrative record is that when the plans go out of business, there are no rates to reconcile. Well, the administrative record contains no evidence that this was ever a problem in any situation. But again, if the plans go out of business and there are no rates to reconcile, that would mean you don't do a reconciliation. It wouldn't mean you do a reconciliation, but you don't do a payment. In that respect, I was a little confused in reading the government's brief, because it seemed at one point that they were talking about a scenario where there was never any sort of a payment, but there was a reconciliation that would affect the rates to be charged for the next year, and that this is simply a rate-setting mechanism. That's correct, Your Honor. The government takes the position in their briefs that the payment always occurs through the process of reconciling rates in the next year. But if you look at what actually happened in the stipulated record in this case, as the panel pointed out in questioning the government, Texas Health Choice was actually paid. A check was actually cut to Texas Health Choice, and then they recouped the money. But there's a reconciliation, if I'm not mistaken. The reconciliation begins the year before the contract in question, where there's an estimate made of rates by the federal government, the rates applied to federal employees, and then at some point later on there's an estimate for the SSSGs, and then there's a reconciliation in April of the actual contract year. Am I correct? That's essentially correct, Your Honor. In May the year before, the plans estimate what they will be charging the appropriate SSSGs. And then in about April of the contract year, the plans and the government true up and they determine what are the correct SSSGs to look at and what are the correct rates to be using. Now, once that reconciliation is determined and the rates are assessed, what happens? Do the rates simply apply for the next calendar year? Or are those adjusted rates used to calculate an adjustment number, either to the government or from the government, for the calendar year? It's the latter, Your Honor. And that's exactly what happens. Okay. So basically the government's approach to this is we'll make it up to you next year. No. The government is making... No, in ordinary cases. In ordinary cases when it's not a plan that's leaving. No, Your Honor, that is not correct. The government can do that or it can do what it did with Texas Health. If you look at what happened here, the government in April does a reconciliation with Texas Health and it determines over the summer Texas Health is owed $622,000. It pays Texas Health the money. Then Texas Health writes a letter and says we're leaving the program and the government says we want the money back. Let's just forget... Suppose they didn't write the letter. What has the government done? Suppose they're still contracting. What has the government done? They see a shortfall in one year's set and they pay for it later in that year or the next year. Correct. And meanwhile the process starts again in the next year if you're staying in the program. I want to call attention, Your Honor, to the waiver issue because there's an argument that was made in GHS's brief that the government hasn't responded to that I want to call attention to. The government argues that somehow by signing this contract the plans waive their rights. I didn't hear Ms. Vandeman argue that here. It's in the brief and you entered it in the brief but I don't think it's proper for you to be rebutting and responding to an argument orally that was not made orally. Fair enough, Your Honor. Let me make one other point about what Ms. Vandeman said. She talked at the end of her argument about subsection B-5 and the effect that that has on the regulation. Subsection B-5 is the regulation which says actual costs cannot cause the rates to be readjusted. You're not asking for actual costs. That seems to be a total red herring here. That's correct, Your Honor. I think we get that. Okay. I have nothing else, Your Honor. All right. Thank you very much. Ms. Vandeman, rebuttal. The carriers claim that the regulation is inconsistent with the statute 8902. The statute does not require reconciliation, does not preclude non-reconciliation. Congress left it up to OPM. Let me stop. I don't think that's actually what they're saying. What I think they're saying is if you take the position and you've taken positions that are not quite the same, one in answer to a question I asked and one in answer to a question that Judge Lynn asked, when I talk to you about the reimbursement, about looking at the non-federal subscribers and the rate they get and trying to square them off, I suggest it to you, and you seem to adopt the proposition that this puts you into compliance with the statute at the command of Congress because the non-federal subscriber rates are a proxy for what costs are. Just costs, not actual costs, just costs. Then when you answered Judge Lynn, you said, no, it has nothing to do with costs. And the problem I have with your answer to Judge Lynn is it puts you in the position of saying that you are not even considering the command of Congress. And it's just that it doesn't enter into your calculations what command of Congress is, that the ratio reasonably and equitably reflect the cost of the benefits provided. If costs have nothing to do with it, then you've just disregarded the command. You haven't even considered the command of Congress. You haven't taken a look at this, which is why I think you need to say that it's a proxy for this issue, that non-federal subscriber rates are a proxy for costs because otherwise you're hanging out there with complete disregard of a congressional mandate. That's my problem with what I regarded as the way you answered Judge Lynn and the way you answered me. And I'm not talking about if you keep raising this issue of actual costs, and I don't think that's an issue. If I could respond, Your Honor, what in the community-rated prepaid plans, the word costs really relates to their estimates of future projected costs in comparison to the revenues that they need and the contracts they made with doctors and hospitals on a prepaid, fixed-rate basis. So OPM has considered costs for prepaid plans, but their prospective in the future, anticipated, and they leave it up to the carriers to estimate what that is, and basically the initial rate that goes into effect on January 1, unreconciled, does meet the statute because that is the carrier's best estimate at the time, negotiated with OPM, about what their anticipated future projected costs and utilizations might be. So OPM did not ignore the statute. It's just that... But aren't you reading a word into the statute? Wouldn't the statute read, the rate shall reasonably equitably reflect the estimated costs of the benefits provided? Well, the statute did not say either because there are many different types of plans. So for experience-rated plans, it might be actual costs, but for community-rated plans, it could be anticipated costs. For other types of plans that are not an issue here, it could be something altogether different, but that's where Congress left the gap for OPM to fill, for community-rated plans, which is what OPM did in the regulation. And one of the key documents is the Federal Register's site in Volume 3 of our appendix, beginning at page 3 and on page 58. And with respect to that, the OIG at page 38 of that volume basically said, okay, we have concerns about the money, but we will defer to the retirement and insurance group within OPM because they're the ones that administer the program. I'm paraphrasing, but they're basically saying we'll defer to them with respect to whatever regulatory revisions are made. Yeah, but the problem I have is that there doesn't seem to be much deferring to Congress. Well, Congress didn't tell OPM how to administer community-rated plans. No, but it just told you what end to achieve, and their argument is that you're not achieving that end and you really didn't even give much consideration to the goal. These decisions were driven by an administrative structure, which I guess people have accepted for years, and nobody stopped and looked and said, well, does this bear any resemblance to the statutory command that we have been given? You're telling me this is the way we do it, and I'm suggesting to you that you have this kind of justification based in what is a clear command of Congress, because while you have a great deal of discretion, you can't ignore the clear command of Congress. And that's the argument. That's where your argument seems to lead. In our reply brief, we quoted the statement of purpose in the statute, which was Congress directing OPM to develop and administer plans that would enable the government to recruit and retain competent personnel at moderate cost and balance a variety of policy and judgment calls, which is what OPM has done, in our view, with respect to the community-rated plans. And so we respectfully request, based on all the arguments we've made in our briefs, that the Court reverse the judgment of the Court of Federal Claims. Thank you. The case is submitted.